IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MORGAN KEEGAN & COMPANY,　　)
　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　)　　CASE NO. 2:11-CV-624-WKW[WO]
　　　　　　　　　　　　　　　)
WILLIAM SHADBURN,　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　)

## ORDER GRANTING PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Plaintiff Morgan Keegan & Company brings this action under the Federal Arbitration Act, *see* 9 U.S.C. §§ 1-16, for declaratory and injunctive relief to prevent an arbitration proceeding brought against it by Defendant William Shadburn ("Dr. Shadburn") before the Financial Industry Regulatory Authority ("FINRA").  Before the court is Morgan Keegan's Motion for Preliminary Injunction (Doc. # 5), which has been fully briefed (Docs. # 13, 21, 25).  For the reasons discussed, Morgan Keegan has shown a substantial likelihood of success on its claim that Dr. Shadburn's FINRA claims are not arbitrable, that it would suffer irreparable injury if compelled to arbitrate, and that the balance of the harms and the public interest weigh in its favor.  Accordingly, the Motion for Preliminary Injunction is due to be granted.

## II.  JURISDICTION AND VENUE

Personal jurisdiction and venue are not contested, and there are adequate allegations of both.  More discussion is required, however, on the issue of subject matter jurisdiction.[1]  Although Morgan Keegan invokes the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, as a source of subject matter jurisdiction, the FAA "bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute."  *Vaden v. Discover Bank*, 129 S.Ct. 1262, 1271 (2009) (internal quotation marks and alterations omitted); *see also Cmty. State Bank v. Strong*, 651 F.3d 1241, 1252 (11th Cir. 2011) ("It is a long-accepted principle that the FAA is non-jurisdictional:  The statute does not itself supply a basis for federal jurisdiction over FAA petitions.").  It must be determined, therefore, whether an independent basis for subject matter jurisdiction exists.

Morgan Keegan also contends that this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Dr. Shadburn's claims in the underlying arbitration include alleged violations of the federal securities laws.  The court agrees

---

[1] Even though subject matter jurisdiction is not contested by the parties, the court has an independent obligation to determine whether subject matter jurisdiction exists.  *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1439 (11th Cir. 1998) (Courts "must inquire *sua sponte* into the source of . . . jurisdiction whenever it might be in question.").

that § 1331 provides an independent jurisdictional basis for subject matter jurisdiction.

In *Vaden*, the Supreme Court held that, pursuant to 9 U.S.C. § 4, federal courts have subject matter jurisdiction to hear a petition to compel arbitration where the underlying dispute between the parties "arises under" federal law.  129 S. Ct. at 1273. A federal court may "look through" a petition under § 4 of the FAA and assess whether it is predicated on an action that "arises under" federal law.  *Id.*  Although *Vaden* addressed a federal court's subject matter jurisdiction to compel arbitration, district courts have applied *Vaden*'s precepts when the motion is instead one to enjoin an arbitration proceeding, and the court agrees with the reasoning of these courts.  *See In re Sept. 11 Litig.*, 765 F. Supp. 2d 587, 591 (S.D.N.Y. 2011) ("Though *Vaden* considered the [jurisdictional] issue in the posture of a motion to compel arbitration, that distinction is legally insignificant" where the issue is whether to stay an arbitration proceeding); *see also UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010) (*Vaden*'s "reasoning applies to situations where, as here, a party seeks to *stay* or *enjoin* an arbitration."), *aff'd*, 405 F. App'x 351 (2d Cir. 2011).

Here, the underlying dispute between Morgan Keegan and Dr. Shadburn includes alleged violations of the Securities Act of 1933, *see* 15 U.S.C. §§ 77a-77aa, namely § 11 (governing misleading registration statements), § 12(a)(2) (governing

material misstatements or misleading omissions in a prospectus or oral communication), and § 15 (governing liability of persons in a position of control over §§ 11 and 12 violators). *See* 15 U.S.C. §§ 77k, 77l, 77o. Dr. Shadburn also alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. (Statement of Claim 6-16.) Federal courts have jurisdiction over claims arising under the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* § 1331 ("The district court shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."). Because the substantive controversy between Morgan Keegan and Dr. Shadburn "arises under" federal law, *Vaden* establishes that subject matter jurisdiction exists over Morgan Keegan's action filed in this court.[2] *See* § 1331; *see also Household Bank v. JFS Group*, 320 F.3d 1249, 1259 (11th Cir. 2003) ("[A] federal district court has subject-matter jurisdiction over a declaratory judgment action if, as here, a plaintiff's well-pleaded complaint alleges facts demonstrating the defendant could file a coercive action arising under federal law.").

The parties also have assumed, without discussion, that the FAA gives this court the power to grant the relief requested, that is, to enjoin the pending arbitration

---

[2] Morgan Keegan also premises subject matter jurisdiction on diversity of citizenship. 28 U.S.C. § 1332(a). Because federal question jurisdiction exists, it need not be decided whether § 1332(a)'s amount in controversy requirement is satisfied.

under the FAA.  Section 4 of the FAA permits a party aggrieved by another party's failure to arbitrate according to the terms of a written agreement to petition the court for an order compelling the arbitration to proceed as agreed.  9 U.S.C. § 4.  Section 4 does not speak to the converse scenario where a party seeks federal court intervention to halt an arbitration on the ground that there is no written agreement to arbitrate. Notwithstanding this silence, the First Circuit has held that "the power to enjoin an arbitration is 'the concomitant of the power to compel arbitration,' and thus the same provision of the FAA, 9 U.S.C. § 4, authorizes both types of orders."[3]  *PCS 2000 LP v. Romulus Telecomm., Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) (quoting *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981)).  On at least one occasion, the Eleventh Circuit has cited the holding in *Societe Generale de Surveillance* as support for its conclusion that "the district court had the power to enjoin the arbitration of the newly-asserted contract

---

[3] District courts have followed suit.  *See Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon*, No. 11-889, 2011 WL 3294682, at *2 (D. Minn. Aug. 1, 2011) (If the parties agreed to arbitrate, the FAA "directs the Court to compel arbitration . . . .  If not, the Court may enjoin the arbitrations pursuant to Federal Rule of Civil Procedure 65."); *J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 76 n.38 (S.D.N.Y. 2010) ("While the FAA only explicitly empowers courts to compel arbitrations, district courts in this Circuit have generally held that district courts have the concomitant power to enjoin arbitration proceedings in appropriate circumstances." (collecting cases)); *Interactive Brokers v. Duran*, No. 08cv6813, 2009 WL 393827, at *6 (N.D. Ill. Feb. 17, 2009) (preliminarily enjoining investors from proceeding with their arbitration proceeding); *Goldman Sachs & Co. v. Becker*, No. 07–1599, 2007 WL 1982790, at *8 (N.D. Cal. July 2, 2007) (granting motion for preliminary injunction in an action brought under the FAA and enjoining the investors "from prosecuting the NASD arbitration against [the member firm]").

claims." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1449 n.23 (11th Cir. 1998).   Finding strong support in the case law, the court concludes that it has the power to enjoin arbitration under the circumstances of this case.

## III.  BACKGROUND

The material facts are undisputed.  Morgan Keegan is a licenced broker-dealer in the state of Tennessee and a member of FINRA. Morgan Keegan was the underwriter of the Regions Morgan Keegan High Income Fund ("RMK Fund"), a closed-end, high-yield fund.  (Statement of Claim ¶¶ 1-2 (Ex. A to Doc. # 2[4]); Compl. ¶ 10 (Doc. # 2); Answer 2 (Doc. # 14).)

Dr. Shadburn, an Alabama citizen, is a retired physician.  He describes himself as a "moderate investor," with his "investment objectives [being] income and capital preservation."  (Statement of Claim 5.)  From 2006 to 2007, Dr. Shadburn invested approximately $80,000 in shares of the RMK Fund.   (Shaburn Decl. ¶ 2 (Ex. to Answer); Statement of Claim 5-6.)  Dr. Shadburn did not purchase the RMK Fund through Morgan Keegan, and he "did not maintain a brokerage account with [Morgan

---

[4] This exhibit is Dr. Shadburn's Statement of Claim filed against Morgan Keegan in the FINRA arbitration.

Keegan]."[5]  (Shadburn Answer 1, 2.)  Rather, he invested in the RMK Fund through

an unrelated, third-party broker-dealer, Synovus Securities, where he maintains an

account.  (Compl. ¶ 10; Answer 2 (admitting ¶ 10 of the Complaint); Statement of

Claim ¶ 5.)  Dr. Shadburn made this investment decision based upon representations

in Morgan Keegan's prospectus and marketing materials that the RMK Fund was

"conservative" and "diversified."  (Statement of Claim 5-6; Shadburn Decl. ¶ 4.)  He

also visited Morgan Keegan's website and examined the written information on the

RMK Fund and other online information posted by Morgan Keegan relating to the

performance and nature of the RMK Fund.  (Shadburn Decl. ¶ 4.)  In fact, the RMK

Fund was a risky investment tied to the high-risk, subprime mortgage market, and

consequently Dr. Shadburn suffered a loss of approximately $67,000 through his

investment in the RMK Fund.  (Statement of Claim 5-6; Shadburn Decl. ¶ 3.)

On June 1, 2011, Dr. Shadburn filed a Statement of Claim initiating arbitration

proceedings before FINRA against Morgan Keegan, based upon alleged "material

misrepresentations and omissions made by [Morgan Keegan] as underwriters of the

[RMK Fund]."  (Statement of Claim ¶ 1.)  In the FINRA arbitration, Dr. Shadburn

---

[5] Morgan Keegan also submitted a declaration from its First Vice President and Associate
Attorney Thomas F. Barnett, who attests that he conducted a records search, which revealed "no
record of any documents, accounts, or files related to anyone named William Shadburn."  (*See*
Barnett Decl. ¶ 5 (Ex. B to Doc. # 1); *see also* Barnett Decl. ¶¶ 7-8.)

seeks approximately $67,000 in damages and asserts violations of the federal securities law, the Alabama Securities Act, and the Tennessee Consumer Protection Act.  It is not necessary for this opinion to recount the sixteen pages of details surrounding Dr. Shadburn's underlying claims brought in the FINRA arbitration because the merits of those claims are not material to the issue of whether Morgan Keegan must arbitrate those claims.  It suffices for present purposes that the gravamen of Dr. Shadburn's claims is that Morgan Keegan fraudulently marketed the RMK Fund and concealed and misrepresented the investment risks.  (Statement of Claim 6-22; *see also* Def. Br. in Opp to Mot. Prelim. Inj. 6 ("The false and misleading marketing material, prospectuses and other investment material provided by Morgan Keegan misled [Dr. Shadburn] as to the risk of the funds, the funds['] underlying assets, and the continued viability of the fund.").

On August 4, 2011, in response to the arbitration proceeding, Morgan Keegan filed this action, seeking declaratory and injunctive relief.  It seeks a declaration that it "has no obligation to arbitrate the FINRA Arbitration initiated by [Dr. Shadburn]." (Compl. 9 (Prayer for Relief).)  Morgan Keegan also requests a preliminary and permanent injunction to enjoin Dr. Shadburn "from further proceedings against [it] in the FINRA Arbitration."  (Compl. 9 (Prayer for Relief).)  The next day, Morgan Keegan filed a Motion for Preliminary Injunction and a brief in support.  (Pl. Mot.

Prelim. Inj. (Doc. # 5); Pl. Br. in Support of Mot. Prelim. Inj. (Doc. # 1).)  Morgan

Keegan effected service of a summons and copies of the Complaint and Motion for

Preliminary Injunction on Dr. Shadburn.  (Docs. # 1, 5, 7.)  On August 15, 2011, the

parties filed a Joint Stipulation as to an agreed-upon briefing schedule for the pending

Motion for Preliminary Injunction.[6]  (Joint Stip. (Doc. # 9).)  Those briefs have been

filed (Docs. # 13, 21), and the motion is ready for a ruling.

## IV.  STANDARD OF REVIEW

On a motion for a preliminary injunction, the court may consider evidence

outside of the pleadings, and a hearing is not required where the facts are undisputed.

See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1313 (11th Cir. 1998) ("[W]here

material facts are not in dispute, or where facts in dispute are not material to the

preliminary injunction sought, district courts generally need not hold an evidentiary

hearing."); see also Multi-Financial Sec. Corp. v. King, 386 F.3d 1364, 1368 (11th

Cir. 2004) (An evidentiary hearing was not required on the issue of whether an

investor was a "customer" of a NASD member "because the underlying factual

circumstances [were] undisputed.").  Here, the evidentiary record includes the

underlying Statement of Claim by which Dr. Shadburn initiated the FINRA

---

[6] In that Joint Stipulation, the parties also represented that they have filed with FINRA the "papers necessary to stay for sixty (60) days the underlying arbitration proceeding."  (Joint Stip. 2.)

arbitration, a declaration from Dr. Shadburn, a declaration from a Morgan Keegan representative, and correspondence from Morgan Keegan's counsel and FINRA in other FINRA arbitrations. A review of the record reveals that the material facts are uncontested and that no credibility determinations need to be made. Hence, the court finds that a hearing is neither required nor necessary.[7]

## V. DISCUSSION

A preliminary injunction may be issued, pursuant to Federal Rule of Civil Procedure 65, to preserve the positions of the parties until a full trial can be conducted. *See Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973). The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

To prevail on a motion for preliminary injunction, the movant bears the burden of demonstrating that

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed

---

[7] Morgan Keegan has not expressly requested a hearing, but has referred to a potential hearing date in its Motion for Preliminary Injunction. (Pl. Mot. Prelim. Inj. 2.) However, the parties' Joint Stipulation contains neither a request for a hearing nor an assertion that the material facts are disputed. The court deems any request for a hearing abandoned, but alternatively finds that one is not needed on this record.

injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).  "'A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'"  *Id.* (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).  Here, Morgan Keegan has demonstrated entitlement to the extraordinary remedy of a preliminary injunction.

**A.     Substantial Likelihood of Success on the Merits**

Morgan Keegan contends that it is substantially likely to succeed on the merits because it did not agree to arbitrate Dr. Shadburn's FINRA claims.  Dr. Shadburn concedes that "[t]here is no written agreement between [Morgan Keegan] and [him]." (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 8 (Doc. # 13).)  He argues, however, that Morgan Keegan is obligated to arbitrate on the basis of FINRA Rule 12200 because

he is Morgan Keegan's "customer."[8]  For the reasons to follow, the court finds that

Morgan Keegan has demonstrated a substantial likelihood of success on the merits

of its declaratory and injunctive relief claims.[9]

Morgan Keegan is a member of FINRA, an industry association that provides

an arbitration forum for claims against its members.[10]  Morgan Keegan does not

---

[8] "[T]he question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator," unless the parties expressly have provided otherwise, *see AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 649 (1986), which they have not in this case.  The decision of whether the parties have agreed to arbitrate is, thus, for the court.  While § 2 of the FAA represents "a national policy favoring arbitration," *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984), the FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989).  "Simply put, parties cannot be forced to submit to arbitration if they have not agreed to do so."  *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992).

[9] The finding that Morgan Keegan is likely to succeed on the merits is addressed solely to the merits of Morgan Keegan's claim that arbitration is not the proper forum to resolve Dr. Shadburn's dispute against it relating to the demise of Dr. Shadburn's investment in the RMK Fund.  In other words, the issue is not whether the underlying claims in the FINRA arbitration have merit, but only whether Morgan Keegan must "defend [Dr. Shadburn's] claims in the arbitral forum."  *King*, 386 F.3d at 1365 n.1.

[10] FINRA, a self-regulatory organization since 2007, was established under Section 15A of the Securities Exchange Act of 1934, 15 U.S.C. § 78o–3, and is vested with the "authority to exercise comprehensive oversight over all securities firms that do business with the public." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, No. 11-235-cv, 2011 WL 4389991, at *5 (2d Cir. 2011) (internal citations and quotation marks omitted).  FINRA is the successor to the National Association of Securities Dealers ("NASD").  *See Kashner Davidson Secs. Corp. v. Mscisz*, 601 F.3d 19, 21 (1st Cir. 2010); *see also Gonchar v. S.E.C.*, 409 F. App'x 396, 398 (2d Cir. 2010) ("In 2007, NASD was consolidated with other regulatory bodies and the name of the new body was changed to the Financial Industry Regulatory Authority, Inc., or FINRA.").
Authority arising under the NASD Code governs and guides interpretations of the FINRA Rules to the extent that there is no meaningful change from the NASD Code.  FINRA Rule 12200 does not materially differ from NASD Rule 10301.  *Accord J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 78 n.45 (S.D.N.Y. 2010).

dispute that as a FINRA member, it is bound to arbitrate all disputes contemplated under FINRA Rule 12200. *See Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004) (The NASD Code of Arbitration Procedure "serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants."). FINRA Rule 12200 provides, insofar as is pertinent here, that arbitration is required when "[r]equested by the customer," and "[t]he dispute is between a customer and a member or associated person of a member" and "arises in connection with the business activities of the member or the associated person." Hence, an investor can compel a FINRA member to arbitrate a claim, even when no written arbitration agreement exists, provided that the investor demonstrates that the dispute (1) is between either a customer and a member or a customer and a member's associated person, and (2) arises in connection with the business activities of the member or its associated person.

The first issue is whether Dr. Shadburn is a "customer" of Morgan Keegan within the meaning of FINRA Rule 12200. Under FINRA, "'customer' is defined simply, but not particularly helpfully, by what it 'shall not include' – a broker or dealer." *AXA Distribs., LLC v. Bullard*, No. 1:08cv188, 2008 WL 5411940 (M.D. Ala. Dec. 24, 2008) (finding that investors in variable annuities were not customers of the company that distributed the variable annuities to broker-dealers that acted as

retailers of variable annuities); *see also UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, No. 11-235-cv, 2011 WL 4389991, at *6 (2d Cir. 2011) (observing that "neither FINRA nor the courts have 'offer[ed] [a] precise definition of 'customer'" (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995)).   The parties disagree on the legal parameters of the definition of "customer" and whether the undisputed facts bestow "customer" status on Dr. Shadburn, such that he can compel Morgan Keegan to arbitrate before FINRA.

Morgan Keegan argues that a customer is one who has a broker or investment relationship with the FINRA member.   It contends that Dr. Shadburn is not its customer because he never purchased any shares of the RMK Fund through Morgan Keegan, never maintained an account with Morgan Keegan, and never had any direct relationship with Morgan Keegan.   In fact, Morgan Keegan's position is that there never was any sort of relationship between it and Dr. Shadburn.   Absent any evidence of a broker or investment relationship, Morgan Keegan maintains that Dr. Shadburn does not qualify as its customer.   (Pl. Br. in Supp. of Mot. Prelim. Inj. Br. 3-4, 10-11, 13-14; Pl. Reply Br. in Supp. of Mot. Prelim. Inj. 4 (Doc. # 21).)   To support its argument, Morgan Keegan relies principally upon *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814 (11th Cir. 1993); *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*,

264 F.3d 770, 772 (8th Cir. 2001); and *Zarecor v. Morgan Keegan & Co., Inc.*, No. 4:10cv1643-SWW (E.D. Ark. July 29, 2011) (Order Vacating Arbitration Award).[11]

Dr. Shadburn argues, on the other hand, that FINRA Rule 12200 is "crystal clear in defining the term 'customer'" to exclude only brokers and dealers. (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 9.) He contends that a "direct customer relationship" is not required, and that because he is neither a broker nor a dealer, he is a "customer" under FINRA's plain meaning. (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 9.) Dr. Shadburn also contends that Morgan Keegan's marketing activities and valuation services upon which he says he and his broker relied in making and maintaining his investments in the RMK Fund solidify the customer relaionship. (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 5.)

The court turns first to the arguments addressed to the scope of the definition of "customer." In *Fleet Boston*, which turned on whether business activities outside of investing or brokerage activities fall within the "customer" definition, the Eighth Circuit rejected an argument that "by negative inference . . . a 'customer' is everyone who is not a broker or dealer." 264 F.3d at 772. That construction is "too broad." *Id.* Instead, the Eighth Circuit held that a "customer" is one who "receive[s]

---

[11] *Zarecor*, an unpublished opinion with no westlaw citation, is attached as Exhibit F to Morgan Keegan's Motion for Preliminary Injunction.

investment or brokerage related services, from an NASD member," and the "customer" definition does not encompass a business relationship that includes only "financial advice" *Id.* at 773; *see also UBS Fin. Servs., Inc.*, 2011 WL 4389991, at *6 (holding that the requisite business relationship exists where the investor "purchases, or undertakes to purchase, a good or service from a FINRA member").  The Eighth Circuit recognized that other courts arguably had "taken a broad view" of the term "customer," but it explained that "in all of these cases there existed some brokerage or investment relationship between the parties."  264 F.3d 772 (citing, among other cases, *Oppenheimer*, 56 F.3d at 358(holding that investors who had been defrauded by a representative of a NASD firm were customers of that firm under the NASD Code, despite the fact that they never opened formal accounts with the firm)); *see also UBS Sec. LLC*, 684 F. Supp. 2d at 356 (observing that it "would be absurd" to interpret "customer" as everyone who is not a broker or dealer because such an interpretation "would imply that a party seeking to compel arbitration pursuant to the FINRA rules need not have an actual customer relationship with any FINRA member; rather, the party need only not be a broker or dealer").  Moreover, in *Wheat First*, the Eleventh Circuit addressed the time frame for analyzing "customer" status: "We . . . hold that customer status . . . must be determined as of the time of the events

16

providing the basis for the allegations of fraud." 993 F.2d at 816 (internal quotation marks omitted).

Under Dr. Shadburn's proposed definition of "customer," the investors in *Wheat First* would have been "customers" (because they were not brokers or dealers), but that was not the court's holding. There, the investors purchased tainted securities from a firm that ultimately sold its assets to a successor firm. The investors sought to compel the successor firm to arbitrate claims arising out of the investors' transaction with the predecessor firm. Absent any written contract to the contrary, the Eleventh Circuit held that to define "customer" as encompassing the investors would contravene the expectations of NASD members as to the scope of arbitrable claims: "We cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer." *Id.* at 820. The successor firm and the investors "had absolutely no relationship at the time of the alleged events that [the investors] seek to arbitrate," and, thus, the investors were not customers of the successor firm. *Id.* at 818.

It is true, as Dr. Shadburn points out, that there need not always be a "direct customer relationship" between the investor and the member firm. (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 9.) However, the cases upon which Dr. Shadburn relies for

17

this general proposition are factually distinguishable. *See, e.g.*, *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001); *King*, 386 F.3d at 1368. In *King* and *John Hancock*, it was undisputed that the investor was a "customer" of the member's "associated person." *See King*, 386 F.3d at 1368; *John Hancock*, 254 F.3d at 58-59. The issue turned on whether the customer of a member's associated person was also the customer of the member, even if the member had no knowledge of the transaction or independent relationship with the investor. In both cases, the member was compelled to arbitrate "solely because" the investor was a customer of the associated person. *King*, 386 F.3d at 1368-69 (Because the investor "dealt directly" with the member's associated person, it was inconsequential that the investor was not a "direct customer" of the member and did not have a "direct transactional relationship" with the member.); *see also John Hancock*, 254 F.3d at 58-60. Alternatively, *King* held that arbitration was required because "[w]hen an investor deals with a member's agent or representative, the investor deals with the member." 386 F.3d at 1370. It was in this factual context that *King* and *John Hancock* rejected the notion that a direct customer relationship between the customer and the member was required.

Here, unlike in *King* and *John Hancock*, the issue is not whether Morgan Keegan and Dr. Shadburn conducted transactions through Morgan Keegan's

associated person.[12]  Neither party invokes the "association person" component of the "customer" definition.   There is no contention that Synovus Securities is an "associated person" of Morgan Keegan or that Dr. Shadburn had any direct dealings or direct transactional relationship with an associated person of Morgan Keegan concerning Dr. Shadburn's RMK Fund investment.  Hence, *King* and *John Hancock* have limited utility in resolving the "customer" issue presented in this case.

The application of "customer" urged by Dr. Shadburn is inconsistent with *Wheat First*'s reasoning and is not supported by either *John Hancock* or *King*. Furthermore, the court finds persuasive *Fleet Boston*'s reasoning for rejecting such a broad construction of the term "customer."   *See* 264 F.3d at 772; *see also Contemporary Fin. Solutions, Inc. v. Miller*, No. 07cv00793, 2007 WL 4197588, at *4 (D. Colo. Nov. 20, 2007) ("Courts generally have construed the term 'customer' broadly, but not so broadly as to include anyone other than a broker or dealer.").  Dr. Shadburn's proposed definition could lead to scenarios where a FINRA member's membership alone would require arbitration.  Such a result would "do significant

---

[12] *Oppenheimer* is distinguishable on the same ground.  *See* 56 F.3d at 352.  In *Oppenheimer*, the investors purchased investments through the member firm's representative who was supposed to maintain the account with the member firm, but who instead fraudulently diverted the funds into an account with a third-party corporation and then depleted the funds. The investors were customers because they invested directly with a firm's authorized agent. When the investors "dealt with" the member firm's authorized agent "they were dealing with" the member firm.  *Id.* at 357.

injustice to the reasonable expectations of [FINRA] members," *Wheat First*, 993 F.2d at 820, and "would contravene the core principle . . . that 'an obligation to arbitrate can be based only on consent.'" *Interactive Brokers, LLC v. Duran*, No. 08cv6813, 2009 WL 393827, at *5 (N.D. Ill. Feb. 17, 2009) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008)); *see also BMA Fin. Servs., Inc. v. Guin*, 164 F. Supp. 2d 813, 819 (W.D. La. 2001) (rejecting a definition of "customer" that would require firms, simply because of their NASD membership, to "arbitrate the claims of any person who purchased an investment, not just the claims of their customers, or the claims of their associated persons' customers" because "[s]uch a boundless definition would surely upset the reasonable expectations of NASD members"). Accordingly, the court declines to find that Dr. Shadburn is a "customer" of Morgan Keegan based solely on the fact that he is neither a broker nor a dealer.

On the other hand, the court also need not adopt the Eighth Circuit's position in *Fleet Boston*, as urged by Morgan Keegan, that a customer is not one who merely receives financial advice, but is one who is "involved in a business relationship with [the] [FINRA] member that is related directly to investment or brokerage services." 264 F.3d at 772. That is because on this record, not only is Dr. Shadburn and Morgan's relationship void of any investment or brokerage qualities, it is void of any

form of business qualities whatsoever.  The list of what their relationship is not is telling on the question of whether Dr. Shadburn is a customer of Morgan Keegan. The list of "nots" is long.

Dr. Shadburn did not have any written contract or customer agreement with Morgan Keegan.  Dr. Shadburn did not purchase shares in the RMK Fund through Morgan Keegan.  Dr. Shadburn did not invest in the RMK Fund in its initial public offering.[13]  He did not pay for any investment, brokerage or other service from or through Morgan Keegan.  He did not have a "direct transactional relationship" with Morgan Keegan (or its associated person).  *King*, 386 F.3d at 1369.  He did not have any direct contact with Morgan Keegan.  Morgan Keegan did not receive or disburse funds associated with Dr. Shadburn's RMK Fund transaction.  It did not facilitate any transaction for Dr. Shadburn's purchase of the RMK Fund.  In fact, Dr. Shadburn did not have an account with Morgan Keegan, and Morgan Keegan does not have a

---

[13] Dr. Shadburn does not challenge Morgan Keegan's contention that "customer" status cannot be attained merely because Morgan Keegan was an underwriter for the RMK Fund years prior to Dr. Shadburn's investment in the Fund on the secondary market through a third-party broker-dealer.  Morgan Keegan's position finds support in the case law.  *See Zarecor*, No. 4:10cv1643-SWW, at 3 (noting that it is "undisputed that Morgan Keegan, a registered member of FINRA, served as an underwriter of the RMK Funds," but rejecting the investors' arguments that they were customers of Morgan Keegan); *see also Goldman Sachs*, 2007 WL 1982790, at *5-6 (finding an alleged customer relationship based upon the member firm's underwriting of another firm's initial public offering too tenuous and noting that there was no indication that the investors participated in the initial public offering).

record of "any documents, accounts or files related to anyone named William Shadburn." (Barnett Decl. ¶ 6.)

Rather, Dr. Shadburn's relationship was with the brokerage firm Synovus Securities. Dr. Shadburn was a brokerage client of Synovus Securities and maintained an account with that firm. Morgan Keegan did not manage or otherwise exercise any discretion over Dr. Shadburn's account. Also, Synovus Securities is not an employee, agent, representative or associated person of Morgan Keegan. Based upon these facts, Dr. Shadburn is not a customer of Morgan Keegan for purposes of FINRA Rule 12100, and thus cannot compel arbitration pursuant to Rule 12200.

On similar facts, the same conclusion was reached in *Morgan Keegan & Co. v. Garrett*, No. 4:10cv4308 (S.D. Texas Sept. 30, 2011) (Order Vacating Arbitration Award).[14] Analyzing whether the investors were Morgan Keegan's customers, within the meaning of FINRA Rule 12200, the court focused on the absence of a "direct relationship" between the investors and Morgan Keegan: "[The investors] bought shares in the fund from third-party brokers on the secondary market. Their information was from the street. They never gave money to Morgan Keegan. They never contacted Morgan Keegan for advice." *Id.* The court concluded that the

---

[14] *Garrett*, an unpublished opinion with no westlaw citation, is attached as an exhibit to Morgan Keegan's Supplement to Reply Memorandum. (Doc. # 22.)

investors were not customers of Morgan Keegan, and, therefore, their claims were not arbitrable. *Id.* at 2.

Dr. Shadburn nonetheless argues that he has a customer relationship with Morgan Keegan for purposes of arbitration because on its public website, Morgan Keegan published materials about the nature and performance of the RMK Fund, to include the prospectus, and that he relied on these materials in making his decision to invest in the RMK Fund. (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 6; Statement of Claim 5; Shadburn Decl. ¶ 4.) The argument is not convincing, as Dr. Shadburn cites no authority on similar or analogous facts to support his argument. Indeed, at least one court has rejected a similar argument on arguably stronger facts. *See Zarecor*, No. 4:10cv1643-SWW.

In *Zarecor*, Morgan Keegan argued that the investors were not customers because they had purchased the RMK Fund from competitor brokerage firms, had maintained the RMK Fund with that firm and "had no dealings with Morgan Keegan." No. 4:10cv1643-SWW, at 3. The investors argued that they were customers, even absent "a direct transactional relationship" with Morgan Keegan, based upon their direct contacts with Morgan Keegan's representatives both before and after investing in the RMK Fund. *Id.* at 8. Those contacts included two conversations with Morgan Keegan's representatives about how the funds functioned,

during which Morgan Keegan represented that "the funds were very liquid," assurances from Morgan Keegan's representatives that "dividends were not in danger" after share prices declined, and the investors' attendance at an annual Morgan Keegan meeting. *Id.* at 8-9. Notwithstanding these contacts, the court was not persuaded that a customer relationship had been established: "Cases in which courts have found a customer relationship based on interactions between an investor and a FINRA member's representative involve conduct on the part of the representative indicating the existence of a business or investment relationship – such as soliciting a purchase, taking money from an investor, or facilitating investment transactions." *Id.* at 9-10 (citing *Oppenheimer*, 56 F.3d at 352 and *John Hancock*, 254 F.3d at 58). The court noted that it found "no cases to support the proposition that an investor achieves 'customer' status under Rule 12200 merely by seeking and receiving information regarding a particular security from a FINRA member representative." *Id.* at 10. The investors were not customers of Morgan Keegan because they "did not have a business relationship with Morgan Keegan related directly to investment or brokerage related services," and even assuming as true that the investors communicated with Morgan Keegan's agents, "those confabs failed to transform [the investors] into 'customers' entitled to demand arbitration under Rule 12200." *Id.*

Here also, as in *Zarecor*, the suggested relationship between Dr. Shadburn and Morgan Keegan is far too tenuous to equate a "customer" relationship.  As already discussed, Dr. Shadburn is not Morgan Keegan's customer within the meaning of Rule 12200.   Moreover, no direct communications even resulted out of Dr. Shadburn's review of Morgan Keegan's online materials, as occurred in *Zarecor*. The mere fact that Morgan Keegan made available to the public on its website materials pertaining to the RMK Fund is insufficient under any of the cases cited above to bestow "customer" status on Dr. Shadburn.  While Dr. Shadburn argues that *Zarecor* is wrongly decided, he fails to present any case law or argument that persuasively supports his attack, or that reached a contrary conclusion on similar or analogous facts.  (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 10.)

Finally, while Dr. Shadburn agrees that "questions of substantive arbitrability are for this court to decide," he argues that decisions of the Director of FINRA on this issue should be given "*Auer* deference."  (Def. Br. in Opp. to Mot. Prelim. Inj. 11-12 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1977) (holding that the Secretary of Labor's interpretation of his own rules is "controlling unless plainly erroneous or inconsistent with the regulation" (citation and internal quotation marks omitted))).) In particular, Dr. Shadburn cites a letter from a FINRA "Case Administrator," notifying Morgan Keegan (in a different case) that the Director of FINRA Dispute

25

Resolution had denied its "request to decline FINRA's arbitration forum."  (FINRA Letter (Ex. E to Doc. # 13).)  Morgan Keegan disputes that *Auer* deference applies to a FINRA decision.  (*See* Pl. Reply Br. in Supp. of Mot. Prelim. Inj. 10 ("FINRA is a self-regulatory organization, not a governmental agency, and is therefore not entitled to *Auer* deference.").)  The court need not resolve this dispute.  Under any standard, no deference is due here because the decision is unaccompanied by any analysis or supporting rationale.  *See Royal Alliance Assocs., Inc. v. Branch Ave. Plaza*, L.P., 587 F. Supp. 2d 729, 735 (E.D. Va. 2008) ("[E]ven if the Court were inclined to give some deference to FINRA's decision, via letter, to deny [the member firm's] request for a stay of the arbitration, . . . the letter, although noting that FINRA undertook 'careful consideration of [the] request,' provides no indication as to whether FINRA considered the question of arbitrability.  Indeed, it provides no reason for the denial at all." (citing *Goldman Sachs & Co. v. Becker*, No. 07–01599, 2007 WL 1982790 (N.D. Cal. July 2, 2007) (finding, in a similar posture, that "[although] [t]he NASD did deny plaintiffs' motion to be excused from arbitration, . . . there [was] little indication that the NASD actually took a close look . . . to see if there was an agreement or relationship that governed the question of arbitrability"))).

In sum, Morgan Keegan has demonstrated that the relationship between it and Dr. Shadburn is too tenuous to establish a customer relationship.  Accordingly, it has

demonstrated a substantial likelihood of success on the merits of its claim that Dr.
Shadburn cannot compel it to arbitrate.[15]

## B.   **Irreparable Injury**

Morgan Keegan also asserts that its "forced participation in the arbitration of
a dispute that [it] [has] not agreed to arbitrate will cause it[ ] irreparable harm."  (Pl.
Br. in Support of Mot. Prelim. Inj. 15.)  It contends that a preliminary injunction is
necessary because otherwise it will have to expend resources and effort in
participating in the arbitration pending resolution of its claims for permanent
injunctive relief, and will lose its right to have Dr. Shadburn's claims decided in a
court, rather than through arbitration before FINRA.  (Pl. Br. in Support of Mot.
Prelim. Inj. 16, 18.)

Courts have concluded that a movant suffers irreparable harm when it is
"forced to expend time and resources arbitrating an issue that is not arbitrable, and
for which any award would not be enforceable."  *Merrill Lynch Inv. Managers v.
Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003); *see also McLaughlin Gormley King
Co. v. Terminix Int'l Co., L.P.*, 105 F.3d 1192, 1194 (8th Cir. 1997) (observing that

---

[15] Because Dr. Shadburn is not a customer of Morgan Keegan's, the court need not, and
declines to, decide whether Dr. Shadburn's claims arose "in connection with the business of"
Morgan Keegan.  *See Wheat First*, 993 F.2d at 820-21 (Given the absence of a customer
relationship, "we do not reach the question of whether the [investors'] claims arose 'in
connection with the business of' [the NASD member].").

courts "uniformly hold that the party urging arbitration may be enjoined from pursuing what would now be a futile arbitration, even if the threatened irreparable injury to the other party is only the cost of defending the arbitration and having the court set aside any unfavorable award"); *Chase Manahattan Bank USA, N.A. v. Nat'l Arbitration Council, Inc.*, No. 3:04cv1205, 2005 WL 1270504, at *3 (M.D. Fla. May 27, 2001) ("Being compelled to arbitrate a claim in the absence of an agreement to arbitrate that claim constitutes an irreparable injury." (citation and internal quotation marks omitted)).  Moreover, Dr. Shadburn "does not dispute the irreparable harm prong" of the preliminary injunction test, presumably based upon the foregoing authority.  (Def. Br. in Opp. to Pl. Mot. Prelim. Inj. 7.)  Because Morgan Keegan has demonstrated a substantial likelihood of success on its claim that it is not obligated to arbitrate, it has demonstrated that it will suffer irreparable injury without a preliminary injunction.

## C.   Balancing of the Harms

Morgan Keegan also satisfies the third element of the preliminary injunction standard.  To balance the harms, the court weighs the harm to Morgan Keegan if a preliminary injunction is not issued against the harm that granting an injunction will cause Dr. Shadburn.  Dr. Shadburn does not articulate any harm that may occur if a preliminary injunction issues.  The court recognizes, however, that if the entry of a

preliminary injunction is ultimately found to be erroneous, then Dr. Shadburn will have suffered a delay in the FINRA arbitration. However, in light of Morgan Keegan's showing of a substantial likelihood of success that it cannot be forced to arbitrate the underlying dispute and the irreparable injury that flows from that forced arbitration, the harm to Morgan Keegan clearly outweighs the harm to Dr. Shadburn. Accordingly, the balance of harms weighs in favor of entering a preliminary injunction.

**D.   Public Interest**

The public interest factor also weighs in favor of Morgan Keegan. Arbitration is in the public interest only where "the subject of the arbitration is one that the parties actually agreed to arbitrate." *Chi. Sch. Reform Bd. of Trs. v. Diversified Pharm. Servs., Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999). Where a party has not agreed to submit a dispute to arbitration, the public has an interest in ensuring that the arbitration does not proceed. *See Berthel Fisher*, 2011 WL 3294682, at *8 ("Public confidence in arbitration would be undermined if a party could be compelled to arbitrate without its consent."). Given the demonstration of a likelihood of success on the merits, the court finds that a preliminary injunction will serve the public interest by avoiding the time and expense that will result from a needless arbitration.

## VI.  CONCLUSION

For the foregoing reasons, Morgan Keegan has demonstrated a substantial likelihood of success on the merits by showing that Dr. Shadburn is not Morgan Keegan's "customer" within the meaning of FINRA Rule 12200, and, therefore, that Dr. Shadburn cannot require Morgan Keegan to arbitrate any dispute between them. Morgan Keegan also has demonstrated that it would suffer irreparable harm if forced to arbitrate a dispute that it did not agree to arbitrate.  The balance of the harms and the public interest also weigh in Morgan Keegan's favor.

Because all four requirements for a preliminary injunction are satisfied, it is ORDERED that Morgan Keegan's Motion for Preliminary Injunction (Doc. # 5) is GRANTED, and that Defendant William Shadburn is immediately RESTRAINED and ENJOINED from pursuing his claims against Morgan Keegan in the arbitration proceeding, styled *William Shadburn v. Morgan Keegan & Co., Inc.*, FINRA Case No. 11-02252, pending a trial on this action.

It is further ORDERED that, on or before **November 17, 2011,** the parties shall jointly confer for the purposes of reaching an agreement on the bond issue and file

a joint report as to the terms of any agreement.[16]  If an agreement cannot be reached, then the parties shall file a statement as to their respective positions, with Morgan Keegan's statement due on or before **November 17, 2011**, and Dr. Shadburn's statement due on or before **November 23, 2011**.  The preliminary injunction shall remain in full force and effect while the bond issue is under consideration.

DONE this 3rd day of November, 2011.

_____/s/ W.  Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[16] The parties have not addressed whether a bond is necessary and, if so, in what in amount.  *See* Fed. R. Civ. P. 65(c) (requiring that the movant "give[ ] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").